Continental Illinois National Bank and Trust Company of Chicago, Appellee, v. J. R. Cardwell et al., Defendants. J. R. Cardwell, Appellant.

Gen. No. 38,495.

228

Opinion filed November 10, 1936.   Rehearing denied November 24, 1936.

Moses, Kennedy, Stein & Bachrach, of Chicago, for appellant; Robert Bachrach and Eugene R. Thorrens, of Chicago, of counsel.

Blum & Jacobson, of Chicago, for appellee; Henry S. Blum, of counsel.

Mr. Justice Scanlan delivered the opinion of the court.

J. R. Cardwell, defendant, appeals from a judgment in the sum of $97,036.31 entered against him on plaintiff's motion for summary judgment in an action upon a written guaranty. The defendant filed written objections to the motion. The motion was heard on the verified complaint, an affidavit of Carl I. Johnson (a vice president of plaintiff bank), defendant's verified amended answer, and counter affidavits made by de-

fendant and E. R. Thorrens, one of his attorneys. Defendant, upon filing his appearance in the cause, demanded a jury trial and before judgment was entered renewed the demand.

The complaint alleges that Rush C. Butler (a codefendant who does not join in this appeal and against whom judgment was taken by default for want of appearance) executed and delivered to plaintiff three certain notes, as follows:

| Date | Maturity | Amount |
|------|----------|--------|
| July 16, 1934 | October 15, 1934 | $125,031.75 |
| July 30, 1934 | October 15, 1934 | 1,854.54 |
| Nov. 13, 1934 | December 13, 1934 | 1,060.00 |

(said notes are fully set forth in the complaint); that defendant Cardwell on October 11, 1929, for good and valuable consideration received by him, executed and delivered to plaintiff bank his continuing guaranty, which is in words and figures as follows:

"For Value Received and in consideration of advances made or to be made, or credit given or to be given, or other financial accommodation afforded or to be afforded to Rush C. Butler (hereinafter designated as 'Debtor'), by Continental Illinois Bank and Trust Company (hereinafter called the 'Bank'), from time to time, the undersigned hereby guarantees the full and prompt payment to said Bank at maturity and at all times thereafter of any and all indebtedness, obligations and liabilities of every kind and nature of said Debtor to said Bank (including liabilities of partnerships created or arising while the Debtor may have been or may be a member thereof), howsoever evidenced, whether now existing or hereafter created or arising, whether direct or indirect, absolute or contingent, or joint or several, and howsoever owned, held or acquired, whether through discount, overdraft, purchase, direct loan or as collateral, or otherwise; and the undersigned further agrees to pay all expenses, legal

and/or otherwise (including court costs and attorneys' fees), paid or incurred by said Bank in endeavoring to collect such indebtedness, obligations and liabilities, or any part thereof, and in enforcing this guaranty. The right of recovery, however, against the undersigned is limited to one hundred thousand Dollars ($100,000), plus interest on all loans and/or advances hereunder and all expenses hereinbefore mentioned.

"In case of the death, incompetency, dissolution, liquidation or insolvency (howsoever evidenced) of, or the institution of bankruptcy or receivership proceedings against said Debtor, all of said indebtedness, obligations and liabilities then existing shall, at the option of the Bank, immediately become due or accrued and payable from the undersigned. All dividends or other payments received from the Debtor, or on account of the debt from whatsoever source, shall be taken and applied as payment in gross, and this guaranty shall apply to and secure any ultimate balance that shall remain owing to said Bank.

"This guaranty shall be a continuing, absolute and unconditional guaranty, and shall remain in full force and effect until written notice of its discontinuance shall be actually received by said Bank, and also until any and all said indebtedness, obligations and liabilities existing before receipt of such notice shall be fully paid. The death or dissolution of the undersigned shall not terminate this guaranty until notice of any such death or dissolution shall have been actually received by said Bank, nor until all of said indebtedness, obligations and liabilities existing before receipt of such notice shall be fully paid.

"The liability hereunder shall in no wise be affected or impaired by (and said Bank is hereby expressly authorized to make from time to time, without notice to anyone), any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modifica-

tion or other disposition of any of said indebtedness, obligations and liabilities, either express or implied, or of any contract or contracts evidencing any thereof, or of any security or collateral therefor. The liability hereunder shall in no wise be affected or impaired by any acceptance by said Bank of any security for or other guarantors upon any of said indebtedness, obligations or liabilities, or by any failure, neglect or omission on the part of said Bank to realize upon or protect any of said indebtedness, obligations or liabilities, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of said Debtor, possessed by said Bank, toward the liquidation of said indebtedness, obligations or liabilities, or by any application of payments or credits thereon. Said Bank shall have the exclusive right to determine how, when and what application of payments and credits, if any, shall be made on said indebtedness, obligations and liabilities or any part of them. In order to hold the undersigned liable hereunder, there shall be no obligation on the part of said Bank, at any time, to resort for payment to said Debtor, or other persons or corporations, their properties or estates, or resort to any collateral, security, property, liens or other rights or remedies whatsoever.

"All diligence in collection or protection, and all presentment, demand, protest and/or notice, as to any and everyone, of dishonor and of default and of nonpayment and of the creation and existence of any and all of said indebtedness, obligations and liabilities, and of any security and collateral therefor, and of the acceptance of this guaranty, and of any and all extensions of credit and indulgence hereunder, are hereby expressly waived.

"The granting of credit from time to time by said Bank to said Debtor in excess of the amount to which the right of recovery under this guaranty is limited

and without notice to the undersigned, is hereby also authorized and shall in no way affect or impair this guaranty.

"No act of commission or omission of any kind, or at any time, upon the part of said Bank in respect to any matter whatsoever, shall in any way affect. or impair this guaranty.

"Said Bank may, without any notice whatsoever to any one, sell, assign or transfer all of said indebtedness, obligations and liabilities, or any part thereof, and in that event each and every immediate and successive assignee, transferee, or holder of all or any part of said indebtedness, obligations and liabilities, shall have the right to enforce this guaranty, by suit or otherwise, for the benefit of such assignee, transferee or holder, as fully as if such assignee, transferee or holder were herein by name specifically given such rights, powers and benefits; but the said Bank shall have an unimpaired right to enforce this guaranty for the benefit of said Bank, as to so much of said indebtedness, obligations and liabilities that it has not sold, assigned or transferred.

"This guaranty shall be construed according to the laws of the State of Illinois, in which State it shall be performed by the undersigned.

"This guaranty and every part thereof, shall be binding upon the undersigned, and upon the heirs, legal representatives, successors and assigns of the undersigned, and shall inure to the benefit of said Bank, its successors, legal representatives and assigns.

"Signed and Sealed by the undersigned, at Chicago, Illinois, this 11th day of October, 1929.

"ok jrw

"<i>J. R. Cardwell</i> (Seal)"
wrv

The complaint further alleges that Isabelle Crilly Butler, on November 15, 1932, executed and delivered to plaintiff her continuing guaranty (which is set forth

verbatim); that plaintiff is the successor to Continental Illinois Bank and Trust Company and the legal holder and owner of the three notes and of the said guaranty; that the said notes have become due by their terms and there is due and owing to plaintiff from defendant Cardwell the sum of $130,990; that defendants promised to pay said sums and that although requested have failed to do so, and the complaint prays for judgment. The verified answer of defendant Cardwell, a document of 23 pages, sets up, according to defendant, 15 separate defenses. According to plaintiff it sets up 53 defenses. We will refer hereafter to the defenses relied upon by defendant.

Defendant states that he executed the guaranty at the request of his friend Rush C. Butler; that about October 10, 1929, Butler called at defendant's office and stated to him that he was developing some very valuable properties in Indian Hill and would require $100,000; that he would need that sum for a year; that he had asked plaintiff bank for a loan for that amount but it refused to make him such loan for more than three months without a guaranty; that Butler asked defendant if he would be willing to guarantee this $100,000 loan with plaintiff bank for one year, provided that he, Butler, put up $250,000 worth of collateral with the bank to secure the loan; that defendant told Butler he would guarantee the obligation for one year; that the next day defendant called at plaintiff bank and saw John R. Washburn, vice president of the bank, in regard to the Butler loan matter; that defendant, who knew Washburn in a social way, told the latter that he would guarantee the loan for one year with the understanding that collateral was to be back of it; that Washburn then stated, ''Your understanding is correct''; ''Sign this and I will fix it up''; that witness said, ''What is this?'' to which Washburn responded, ''That is a guarantee of Butler's $100,000.00 loan for one year''; that when the loan for $100,000 matured in

1930 he consented to an extension for one year because Washburn assured him that there would be no extension beyond October 11, 1931, and that Butler would be required to pay the loan by that date. *Washburn died March 7, 1933*. On February 9, 1934, Cardwell called at plaintiff bank in response to a request by it for payment under his guaranty. In defendant's amended answer he avers that after a conversation between two representatives of the bank and defendant on that date the said representatives made the following memorandum of record:

"Mr. L. S. Ford and the writer have had a conversation with J. R. Cardwell concerning his guaranty on the obligation of Rush C. Butler. This is a conclusion of several telephone conversations and also a discussion which we had in September last at which we brought to Mr. Cardwell's attention the fact that we would probably have to have recourse on him to the extent of some portion of his guaranty. He now states that he believes this guaranty should be cancelled for three reasons:

"(1) That his original transaction with Butler and John R. Washburn called for a one year carry on our part. Mr. Cardwell states that in the fall of 1930, Mr. Washburn called him, indicated that Butler wanted a year's further extension and further indicated that the assets traced were well over $100,000. Cardwell states that he demurred, but upon further conversation with Butler, agreed to a one year's extension. Inasmuch as in the fall of 1931, when the second year had expired, he heard nothing more from either Butler or Washburn, he feels that he had reason to believe that the debt had been taken care of.

"(2) He mentions that at one time he had $125,000 to invest and in talking to Mr. Washburn indicated to him that the safety of the principal was the first consideration. Subsequently there was sent to him Mr. Warren Illick of the Continental Illinois Company,

who sold him securities, including Chilean bonds, on which it was necessary for him to take a very substantial loss.

"(3) The Grigsby-Grunow Company, in which he was interested as a stockholder, owed this bank $1,000,000 and demanded its money. As a result, he and others made advances to the Grigsby-Grunow Company, he to the extent of $250,000, which money he contends directly benefited us."

On April 17, 1934, defendant sent the following letter:

"Mr. Chris M. Smits, Vice President,

"Continental Illinois National Bank & Trust Co.,

"231 South LaSalle Street,

"Chicago, Illinois.

"Dear Mr. Smits:

"In October, 1929, your bank loaned to Mr. Rush C. Butler the sum of $100,000 on a note due in one year. I guaranteed the payment of the loan.

"When the note became due in October 1930, one of the officers of your bank called me into his office and stated that if I would agree to an extension of the loan for one year, no further extensions would be granted and Mr. Butler would be required to pay the loan at the end of the year. I did not desire to permit any extension and so informed your officer. However, he assured me that he had checked Mr. Butler's collateral and that the same was worth considerably more than the obligation it secured. He urged me to extend the time for Mr. Butler to pay this note for one more year so that Mr. Butler might preserve as much of the collateral as he could. I finally yielded to his earnest solicitation and consented to another year's extension, that is, until October, 1931, with the distinct understanding, however, that no further extensions would be made and that Mr. Butler's obligation would be paid at the expiration of the extended period. Your officer promised me that the matter would be taken care of

along those lines and in my presence made a written memorandum to the effect that no further extensions would be granted and that Mr. Butler's note must be paid at the end of the extension in October, 1931.

"Now your bank is demanding a statement from me.

"From the time that I had this conversation with your officer with reference to this extension, I heard absolutely nothing about Mr. Butler's obligation for almost three years, at which time I was informed that the officer had not kept his promise to enforce collection from Mr. Butler in October 1931 but had, on the contrary, given Mr. Butler a number of extensions; had never taken any steps against Mr. Butler to enforce the collection of the note when the same became due in October 1931, and worst of all, had never communicated with me or notified me that the bank was still looking to me under my guaranty to take care of this account. Indeed, your officer knew that I believed that the Butler note had been paid in full. He stated to Mr. Butler himself that I believed the note had been paid. The very fact that I was permitted to go along under that belief for a period of two years shows either that the bank regarded my liability on the guaranty as terminated or it was a deliberate intent on the part of your bank, through its officer, to mislead me.

"I have had at all times the greatest confidence in your bank and in your organization. I feel that my confidence in your bank has been most woefully abused by some of the officers thereof. This is true not only in connection with the transaction involving Mr. Butler's note but in some other matters which I now want to call to your attention.

"In July, 1930, I had $135,000 on deposit in my account in your bank. It was my desire to preserve this principal for the purpose of meeting obligations maturing in October 1931. Above all else, I wanted safety of principal. The income from the investment

did not mean so much to me but the safety of the principal meant everything. I went to the same officer of your organization in July 1930 and told him my situation, going into considerable detail in connection therewith. I told him that I wanted to invest $135,000 and that I was willing to rely entirely upon the judgment of your organization in making the investment. I told this officer that I knew nothing about bonds and that I was perfectly willing to turn my $135,000 over to him and let him, on behalf of your organization, invest the same for me in such a way that I would be assured of the principal when I needed it in October 1931.

"Your man told me that your bank would be glad to make the investment for me and that I could depend upon it, that, as he expressed it, 'we will sell you some bonds, and what we sell you will be as good as gold.' Your organization took my $135,000 and delivered to me in place thereof German Government 5½% bonds and Chilean 6% bonds. Since then I have been informed that as I told your bank that I wanted to have the money available to meet obligations coming due in October 1931, that as bankers, your organization should not have sold me these bonds even if they had been good because they were long term bonds. What your bank should have sold me was a short term investment which could readily have been converted into cash at the time in October 1931 when I would need it.

"What happened to these bonds, it is unnecessary for me to tell you. Suffice to say that my loss on these two issues was over $100,000 in cash.

"What makes this situation even less palatable than it would otherwise have been is the fact that a short time ago I was informed by a man who was associated with your organization at the time these bonds were sold to me, that it was well known among the officers of the bank that these bonds were not a sound investment. I was also told that your bank has a great num-

ber of these bonds on hand and wanted to unload them; that I came along just about that time and they were unloaded on me. I have also been told that at the time your bank sold the German bonds to me it was maintaining the market for these bonds. Some time ago I read in the papers that one of the federal judges in the East found that where a pool was maintaining a market for a certain stock the members of the pool were liable for fraud to a buyer of the stocks.

"In view of the loss that I sustained on these bonds, it is quite conceivable that for that reason your officer hid from me the fact that the Butler note had not been paid.

"I have had one other major sad experience with your bank. On June 24, 1930, your bank was carrying certain loans made to Grigsby-Grunow Company, amounting to over $1,000,000. The Grigsby-Grunow Company, of which I was a director, needed capital to carry on its business. Your bank notified me, as well as officers of the company, that the bank would call these tremendous loans unless Mr. Grigsby, Mr. Grunow and I loaned to the company a certain amount of money. It was agreed between the officers of your bank and ourselves, as individuals, that if we would lend the money to Grigsby-Grunow Company as individuals, our individual loans would be on a parity with the bank's loan and that if any money were collected on the loans made to Grigsby-Grunow Company, there should be no priority either for the bank or for ourselves. In other words, your bank promised that, if we would individually loan the money required to Grigsby-Grunow Company, we would share and share alike with the bank on a pro rata basis as to all moneys collected from that Company by the bank as well as by us individually. Having confidence in the good faith of your officers, we individually loaned the Grigsby-

Grunow Company money. My proportionate share of the amount loaned was $250,000.00.

"In violation of your bank's agreement with me as an individual, the bank collected the amount due to it in full. My loss on this transaction, directly traceable to my faith in your organization and the bad faith shown on the part of the bank, was $250,000.

"I am not anxious to resort to technicalities and counterclaims as a defense to your claim against me. Neither, however, am I going to sit back quietly and without complaint while this guarantee is outstanding. I feel that this is a matter that does not belong in the courts. This is a matter of fair dealing between your bank and myself. You have a remedy against Mr. Butler. Sue him forthwith and take judgment against him and collect it. Also go after the collateral. In equity and good conscience you should cancel my guaranty.

"I have been badly used by your bank because of misplaced confidence in one of your officers. It seems to me that my faith in your organization has already cost me enough money.

"I shall be interested to hear what your views are upon this subject in the light of the facts as I have given them to you in this letter.

"Very truly yours,

"(Signed)    J. R. Cardwell."

After this letter was received there were two extensions of the Butler indebtedness, one on May 29, 1934, and the other on July 16, 1934.

Defendant states his theory of the case as follows:

"A summary judgment before trial by jury should not have been entered against the defendant where he had meritorious defenses, some of which raised questions of fact, and, where he also had substantial counterclaims.

"It is the theory of the defendant, J. R. Cardwell, in support of his principal defenses (Nos. VIII and IX):

"(1) That he, the defendant, as an accommodation guarantor, was discharged from liability, by reason of the renewals or extensions, or payment (by new notes) of the existing indebtedness, without the knowledge or consent of the guarantor, after discontinuance of the guaranty, which was revocable.

"(2) That discontinuance of the guaranty, by notice, ended plaintiff's authority, under the provisions of the instrument, to grant renewals and extensions; that such renewals or extensions granted to the principal, without authority of the guarantor, released him.

"3. The provision in the guaranty, relied on by plaintiff:

" 'This guaranty shall be a continuing, absolute and unconditional guaranty, and shall remain in full force and effect until written notice of its discontinuance shall be actually received by said Bank, and also until any and all said indebtedness, obligations and liabilities existing before the receipt of such notice shall be fully paid.'
did not require defendant to pay the existing indebtedness of the principal *before* he could, by notice, require the plaintiff to discontinue the guaranty as to *future transactions*. Said provision merely means that the *existing claims* of the plaintiff, under the guaranty, shall remain in force (unless paid, renewed or extended,) even after discontinuance of the guaranty.

"4. In any event, where the plaintiff accepted a new note, or notes (after notice of discontinuance of the guaranty) in payment of the then existing indebtedness, said quoted provision was either complied with or immaterial, inasmuch as the liability under the guaranty (the existing indebtedness of the principal) was so paid by the principal's new notes.''

Defense VIII, set up in defendant's answer, reads as follows:

"That defendant by letter and oral notice on and before April 17, 1934, terminated the guaranty, as to all transactions thereafter between plaintiff and Rush C. Butler; that the notes set forth in the complaint evidenced transactions subsequent to said notice of termination; that on July 16, 1934, after such notice of termination of the guaranty, plaintiff accepted from Rush C. Butler the $125,031.75 note set forth in the complaint, in payment and discharge of all notes previously executed by Rush C. Butler, and surrendered to Rush C. Butler all such notes previously executed by Rush C. Butler, marked 'Paid.' "

Defense IX, set up in that answer, reads as follows:

"(As an alternative to Defense VIII.) That plaintiff twice granted binding extensions of time of payment, or renewals, of the indebtedness of the principal, Rush C. Butler, for a definite period of time, without the knowledge or consent of this defendant, subsequent to the termination of the guaranty; that the $125,031.75 note, sued on in the complaint, evidences such an extension or renewal. Wherefore the defendant was discharged from liability."

Plaintiff states its theory as follows:

"1. That because of the express language of the guaranty, Cardwell's letter and oral statements, even though considered effective to terminate or discontinue the guaranty, did not deprive the Bank of its right to renew or extend Butler's obligation without impairing or prejudicing its rights against Cardwell.

"2. That even though Cardwell's letter be construed to be a notice of termination or a discontinuance of the guaranty, the notice was, under the terms of the guaranty, ineffective without the payment of the indebtedness then existing.

"3. That Cardwell's letter is not a clear and unambiguous notice of termination or discontinuance and hence it is not effective for that purpose.

"4. Construing Cardwell's letter and his oral statements a demand to sue, the Bank's failure to sue upon such demand, because of the express language of the guaranty, does not release Cardwell on his guaranty.

"5. That the conversations between Cardwell and Washburn claimed to have taken place at the time of the signing of the guaranty do not amount to fraudulent representations.

"6. That the original loan made to the Upham-Reynolds Syndicate was legally enforceable by the Bank even though approved by Waldeck. Even though it were otherwise, the loan to Butler of $21,616.69 to discharge his obligation to the Upham-Reynolds Syndicate was a lawful loan, legally enforceable against Butler and Cardwell."

Defendant contends that "by reason of the two extensions of time, or renewals, granted by plaintiff to Rush C. Butler of his obligation to plaintiff, once on May 29, 1934, and again on July 16, 1934, after notice of revocation of the guaranty, defendant was discharged from all liability upon his guaranty." Upon the oral argument counsel for defendant stated that this contention involved their most vital defense. To repeat the language of the guaranty dealing with the right of the bank to renew or extend Butler's obligation:

"The liability hereunder shall in no wise be affected or impaired by (and said Bank is hereby expressly authorized to make from time to time, without notice to anyone), any . . . renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or other disposition of any of said indebtedness, obligations and liabilities, either express or implied, or

of any contract or contracts evidencing any thereof, or of any security or collateral therefor.''

Under this provision the right of the bank to grant renewals or extensions without such action affecting defendant's liability under the guaranty is clear. To escape the effect of the provision defendant states: ''But such permissive provision was not operative at the time of the extensions or renewals in May and July, 1934, for the reason that such authority to make extensions and renewals had been withdrawn by the guarantor on or before April 17, 1934, by his notice of revocation of the guaranty.''

The language in the guaranty that bears upon the alleged revocation reads as follows:

''This guaranty shall be a continuing, absolute and unconditional guaranty, and shall remain in full force and effect until written notice of its discontinuance shall be actually received by said Bank, *and also until any and all said indebtedness, obligations and liabilities existing before receipt of such notice shall be fully paid.*'' (Italics ours.)

Even if defendant's letter could be construed as a notice of revocation, such notice without the payment of the indebtedness then existing was under the express language of the guaranty not sufficient to terminate it. To revoke or discontinue the guaranty requires (1) the receipt by the bank of a written notice of discontinuance, and (2), ''and also until any and all said indebtedness, obligations and liabilities existing before receipt of such notice shall be fully paid.'' The conjunction ''and,'' followed by the word ''also,'' makes the intent of the provision absolutely clear. Defendant, in support of his contention that he did not have to pay the indebtedness in order to revoke the guaranty, cites the principle of law that the undertaking of a surety is to be strictly construed and his liability is not to be extended by construction, but we are unable to see how that principle applies to the clear and un-

ambiguous language of the guaranty now under consideration. The rule cited by defendant is not intended to relieve a guarantor of liability by a nullification or emasculation of the plain language of the guaranty. In *Mamerow v. National Lead Co.*, 206 Ill. 626, 632, the court said:

"If a guaranty is clear in its terms it must be interpreted and construed according to the language used; 'that is to say, the parties must be presumed to have meant that which their language clearly imports. It is not what one of the parties may have intended, but what is shown by the contract to have been the intention of both parties.' *Peoria Savings, Loan and Trust Co. v. Elder*, 165 Ill. 55."

Even if defendant had the right to revoke the continuing guaranty without payment of the Butler indebtedness to the bank, his letter of April 17 is not a notice of revocation. Indeed, defendant recognizes in the letter that the guaranty was outstanding, and he expresses the opinion that "in equity and good conscience you should cancel my guaranty." As we interpret the letter it was not intended as a notice of revocation. Defendant charges in it that he lost over $350,000 through the fraudulent conduct of the bank in connection with several bond transactions and through its bad faith and violation of its agreement in connection with the Grigsby-Grunow matter, although none of these alleged transactions had anything to do with the Butler loan and the guaranty. Defendant states in the letter that the instant claim (one founded upon a written guaranty, taken in the ordinary course of banking business) *"is a matter that does not belong in the courts,"* and he plainly intimates that if the bank presses its claim he will resort to counterclaims which will involve charges of fraud and bad faith against the bank. The record shows that defendant is connected with numerous important business enterprises and is accustomed to large transactions with banks. If he

desired to revoke his guaranty he should have so stated in his letter. This he did not do. Apparently understanding that a notice to revoke, without the payment of the then indebtedness, would avail him nothing, he resorted to threats. In *Lanusse v. Barker,* 16 U. S. (3 Wheaton's Rep.) 101, 143, the Supreme Court of the United States says:

"Nothing could be more inconsistent with that candor and good faith which ought to mark the transactions of mercantile men, than to favor the revocation of an explicit contract, on the construction of a correspondence nowhere avowing that object. It was in the defendant's power to have revoked his assumption, contained in the letter of the 9th, at any time prior to its execution, but it was incumbent on him to have done so, avowedly, and in language that could not be charged with equivocation."

But defendant further contends: "In the event that a fair construction of the guaranty requires payment of past indebtedness as a condition precedent to revocation the condition was performed by plaintiff's acceptance of new notes in payment of Butler's old notes." It will be noted that this contention is based upon the assumption that defendant's letter of April 17, 1934, to the vice president of plaintiff bank, constituted a revocation of the guaranty. Our holding that it did not would be a sufficient answer to the contention, but aside from that holding, there is no real merit in the contention. In defendant's brief it is stated: "We submit that the records of the plaintiff bank, together with the admissions of plaintiff, thus demonstrate that the bank accepted in payment of all indebtedness, liabilities and obligations of Rush C. Butler existing prior to April 17, 1934, the date of revocation, the July 16th, 1934 $125,031.75 note, upon which plaintiff sued herein; that that new note constitutes a new indebtedness, of Butler." The lengthy argument in support of the instant contention centers

upon the Rush C. Butler account in plaintiff's ledger. That account and the undisputed facts set up in the affidavit of Carl I. Johnson, a second vice president of plaintiff bank, show that the note for $125,031.75 executed by Rush C. Butler on July 16, 1934, was accepted by plaintiff in renewal of the obligation due from Butler to plaintiff bank on that date; that no money or other consideration was paid or delivered to plaintiff by Butler or anyone on his behalf at the time of the delivery of the renewal note, nor at any other time, as a consideration for the extension of the obligation; that it is the practice pursued by plaintiff in the conduct of its business upon the delivery to it of renewal or extension notes to redeliver to its customers the extended obligations, marking the same ''Paid'' with a stamp. Defendant argues that the use of the word ''Paid'' by the bank shows that it considered the old note paid and that the new note constituted a new indebtedness. We are justified in taking judicial notice of the fact that it is the practice of banks when they take a renewal note to mark the surrendered note paid. The general rule is that where a note is given merely in renewal of another note and not in payment, the renewal does not extinguish the original debt nor change the debt except that it postpones the time for payment. The case of *Gay v. Ward*, 67 Conn. 147, cited by defendant in support of the instant contention, is not in point under the facts. Here the money lent to Butler upon the execution of the guaranty has never, in fact, been paid. Judgment was taken against Butler by default. No cash was paid by way of principal or interest to the bank at the time it took the renewal note in question, nor at the time it took the renewal notes of March 17, 1934. The loan of $100,000 was reduced, by payments, to $92,500. This sum, with the accrued interest, is the amount of the judgment in this case. To avoid any confusion in respect to the note sued upon, for $125,031.75, executed by Butler on July

16, 1934, we may state that after the original loan of $100,000 had been made to Butler plaintiff made a further loan to him of $21,616.69, and at the time the note for $125,031.75 was executed Butler's debt to plaintiff, represented by the balance due on the original note, the loan of $21,616.69, some minor items representing advancements by plaintiff to Butler, plus accrued interest, amounted to $125,031.75, but defendant guaranteed Butler's indebtedness to plaintiff in the amount of $100,000 only.

Defendant contends that "plaintiff's false and fraudulent representations to the guarantor as to the nature, duration and termination of the guaranty constitute a complete defense to the defendant." Defendant claims that he signed the guaranty without reading it because John R. Washburn, then a vice president of the plaintiff bank, told him that it was a one-year guaranty for a $100,000 loan and that it was not necessary for him to read the guaranty nor the fine print provisions in it; that he regarded Washburn as a truthful and dependable man and a responsible bank officer and signed the guaranty without reading it upon the said representations. As we have heretofore stated, Washburn died March 7, 1933. On February 9, 1934, defendant called at plaintiff bank in response to a request by it for payment under his guaranty. In his amended answer he avers that after a conversation between two representatives of the bank and himself on that date, the representatives of the bank made a memorandum of record of his three reasons why the guaranty should be canceled, and he sets up the memorandum. In none of the three reasons did the defendant claim that Washburn made false representations to him at the time of the signing of the guaranty. It will be further noted that in defendant's carefully prepared letter of April 17, 1934, in which he warned the bank of the nature of the defense he would make if it sued him under the guaranty, he made no claim

that he signed the guaranty without reading it because of false representations made to him by Washburn; nor does he mention Washburn in the letter. All that defendant states therein as to the making of the guaranty is: "In October, 1929, your bank loaned to Mr. Rush C. Butler, the sum of $100,000 on a note due in one year. I guaranteed the payment of the loan." He does state in the letter that in October, 1930, he consented to another year's extension of Butler's note, "with the distinct understanding, however, that no further extensions would be made and that Mr. Butler's obligation would be paid at the expiration of the extended period." During his examination in respect to the alleged extension the following occurred: "Q. Did you understand that if the loan was not paid within that year, or at its maturity by anybody, and the collateral was not adequate, that you would be liable on your guarantee? A. I did. Q. Did they ask you to sign any other papers at that time? A. No. Q. So that it was your understanding that if the Butler obligation was not paid by October, 1931, and the collateral was not adequate, you would be liable on the guarantee that you signed in 1929? A. Yes, sir." Defendant concedes that the written guaranty was not changed upon its face nor by any other instrument, in October, 1930, nor at any other time. The defense involved in the instant contention is an afterthought made possible by the death of Washburn. The alleged false representations are put into the mouth of a man who could not deny them. The undisputed evidence shows that Ruth Curriden was Washburn's secretary, that she was the only person other than Washburn who occupied the latter's room during 1929 and 1930, and that she died on September 18, 1934. Approximately a year after the death of Washburn and six and one-half months after the death of Ruth Curriden the instant defense was first asserted by defendant, and then in an amended answer. Defendant admits that Washburn and he were

the only parties to the alleged conversation. It is contended that even though defendant's testimony in respect to the alleged false representations is contradictory, nevertheless, he was entitled to a jury trial upon that issue, though we might think, upon the whole evidence, that the defense was ''a sham.'' We recognize the principle of law involved in the contention and have stated certain transparent facts for the purpose of showing the real character of the defense and that the case is not one where plaintiff took unfair advantage of defendant.

Plaintiff contends that under section 4 of the Evidence Act the testimony of defendant as to the alleged false representations was not competent. The pertinent part of the section reads as follows:

''. . . And in every action, suit or proceeding a party to the same who has contracted with an agent of the adverse party—the agent having since died—shall not be a competent witness as to any admission or conversation between himself and such agent unless such admission or conversation with the said deceased agent was had or made in the presence of a surviving agent or agents of such adverse party, and then only except where the conditions are such that under the provisions of sections 2 and 3 of this act he would have been permitted to testify if the deceased person had been a principal and not an agent.''

Defendant concedes, as he must, that if Washburn and he were alone at the time of the alleged misrepresentations plaintiff's contention would be sound because of the death of Washburn, but he argues that the testimony was competent because he testified that the conversation with Washburn was had in the presence of another ''surviving agent'' of plaintiff. Defendant's direct testimony in respect to the ''other surviving agent'' is as follows: When he arrived at Washburn's office, in October, 1929, the guaranty was ready for

signing; that there was a young lady in the office at the time, probably Mr. Washburn's secretary; that he did not know her and would not be able to recognize her; that he thinks she was "within earshot" at the time he and Washburn held their conversation. During his direct examination the following occurred: "Q. So, with respect either to your first or your second conversation, you would not state positively and of your own knowledge that there was anybody present other than you and Mr. Washburn? A. That is true." The cross-examination of defendant by his counsel took place at a later session, during which cross-examination defendant testified that there was a young lady present; that she was sitting about 10 feet from Washburn and defendant while they were talking. Questioned again by plaintiff's attorney, defendant stated that the woman was sitting at a typewriter desk working at "some papers, figures," that she appeared to be employed on some papers that were before her; that she was not facing defendant and Washburn and that she did not join in the conversation in any way. Section 4 certainly contemplates that the proof must show that the surviving agent either took part in the conversation or, at least, heard it. If it be assumed that this woman was an agent of plaintiff, within the meaning of the statute, nevertheless it does not appear from defendant's testimony that she heard what was said between defendant and Washburn. Moreover, the evidence shows clearly that the only person save Washburn who occupied Washburn's office at the time was Ruth Curriden, who was also deceased at the time of the hearing. But defendant contends that plaintiff waived any question as to the competency of the evidence in question by examining defendant in respect to the conversation. This contention lacks merit. Defendant does not claim that plaintiff's counsel asked the witness to give the conversation or any part of it.

When counsel for plaintiff examined defendant on direct, it appears that he carefully avoided asking him for the conversation or any part of it. As plaintiff states, the questions upon direct were intended to bring out who were present at the time of the alleged conversation and for the sole purpose of enabling plaintiff to show that there was no witness to the alleged conversation now living, save defendant. We think that the contention of plaintiff that defendant's evidence as to the alleged false representations was, under section 4 of the Evidence Act, Ill. State Bar Stats. 1935, ch. 51, ¶ 4, not competent, is a meritorious one.

Plaintiff contends that defendant, under the particular facts of the instant case, should be precluded from relying upon the alleged fraudulent misrepresentations upon the additional ground that no special relations existed between him and plaintiff which entitled him to rely upon the representations as to its terms; that he, an able and experienced man, had full opportunity to read the guaranty, and his conduct constituted such neglect as precludes him from raising the instant contention. Undoubtedly there are numerous cases supporting plaintiff's position, although there are also cases in which the courts, under certain states of fact, have refused to allow the defendant's negligence to be interposed. Defendant cites such cases as *Gunning Co. v. Cusack*, 50 Ill. App. 290, and *Security Trust & Savings Bank v. Telford*, 211 Ill. App. 149, in support of his position that negligence cannot be predicated upon failure to read a document as against a party guilty of fraudulent misrepresentations as to its contents. In the *Gunning* case the signer of the agreement could not read English, and it was claimed that the agreement was misread to him. In the *Security Trust & Savings Bank* case the defendant was unable to read the writing by reason of age and failing sight, and it was claimed that the contents of the writing

were misrepresented to him. There are other cases similar to the two cited. The pleadings and testimony show that defendant is a man of very large means, a manufacturer of railway supplies, president of the Cardwell Westinghouse Company, director in the Diamond T Motor Company, director in the Grigsby-Grunow Company, and "connected with the Acme Card System Company, the Cardwell Manufacturing Company and Cardwell Securities Company." He was accustomed to dealing with banks in business matters involving very large sums of money. Butler, not the bank, asked him to sign the guaranty, and he understood, when he went to the bank, the nature and import of the instrument that he was to sign. If the doctrine of negligence can ever be invoked where fraudulent misrepresentations are alleged, the instant case would seem to be one for its application. That it would be dangerous for banks to loan money upon written guaranties if the instant defense were to prevail, is evident. However, we do not deem it necessary to decide the instant contention raised by plaintiff. Nor do we deem it necessary to pass upon the additional contention of plaintiff that the alleged false representations do not constitute false representations within the meaning of the law.

Defendant contends that the action of the trial court in granting a summary judgment deprived him of his right to a trial by jury, because there was involved a dispute as to three material facts. Upon the oral argument defendant's counsel conceded that two of the alleged questions of fact involve only questions of law. We have considered the remaining alleged question of fact and find that it does not present any question of fact upon which a jury would be warranted in finding the issues for defendant.

While defendant, as a part of his amended answer, filed counterclaims against plaintiff, as he threatened

in his letter of April 17, 1934, he would do, he does not in his ''errors relied upon for reversal'' refer to the subject of counterclaims, nor does he in his argument raise any question in reference to counterclaims.

We have patiently and carefully considered the points presented by the able and ingenious lawyers for defendant. In our opinion the judgment of the circuit court should be affirmed and it is accordingly so ordered.

*Judgment affirmed.*

JOHN J. SULLIVAN, P. J., and FRIEND, J., concur.